## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ERIC HERMAN, individually and on behalf of a class of similarly situated individuals,<br><br>     *Plaintiff*,<br><br>v.<br><br>SEMPRIS, LLC, a Delaware limited liability company, E. MISHAN & SONS, INC., a New York corporation d/b/a EMSON, INC., and QUALITY RESOURCES, INC., a Florida corporation,<br><br>     *Defendants*. | **FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**<br><br><br>Case No. 1:13-cv-0020<br><br><br>Honorable Janet T. Neff |

Plaintiff Eric Herman brings this First Amended Class Action Complaint against

Defendants Sempris, LLC ("Sempris"), E. Mishan & Sons, Inc. d/b/a Emson, Inc. ("Emson"),

and Quality Resources, Inc. ("Quality Resources") (hereinafter collectively "Defendants") on his

own behalf, and on behalf of Classes of similarly situated individuals who were deceptively

enrolled in and charged for Sempris Membership Programs. Plaintiff alleges as follows upon

personal knowledge to himself and his own acts and experiences and, as to all other matters,

upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE CASE

1.  Defendants work together to charge consumers recurring monthly fees for

"Membership Programs" that purport to offer discounts, coupons, and other money saving deals.

Using the sale of a legitimate product as bait, Defendants acquire consumers' billing and contact

information and then use this information to fraudulently induce consumers into enrolling in

Sempris Membership Programs with recurring monthly fees.

2.      The deceptive scheme is perpetuated in the following way: After viewing a television infomercial or online advertisement, an interested consumer visits one of Defendant Emson's websites to make a purchase. To complete their purchases, consumers are required by Emson to provide their private billing and contact information, such as their telephone number, billing address, and credit or debit card number, to the website. After the online transaction is completed (and unbeknownst to the consumer), Emson transfers the consumer's private contact, billing, and order information to its business partner, Defendant Quality Resources, a third-party telemarketer. Quality Resources then uses the information to place unsolicited telephone calls to the consumer for the purpose of marketing Defendant Sempris's Membership Programs.

3.      Using the pretense of verifying the details of the consumer's Emson order, Quality Resources calls the telephone number the consumer previously provided to Emson. From the outset of the call, Quality Resources is already in possession of the consumer's billing and contact information (including all or part of the consumer's credit or debit card number and billing address) that Emson provided or made available to it as part of the data pass.

4.      After assuring the consumer that the call is for quality assurance, consumer protection purposes, the caller goes through the consumer's Emson order details (an unnecessary step designed merely to confuse consumers into believing the call is related to their Emson order and to induce them to stay on the line). Following confirmation of the prior order, the Quality Resources operator promptly begins to aggressively market Membership Programs offered by Sempris and other vendors that feature introductory "trial periods" (usually between 14 and 30 days, depending on the program) followed by recurring monthly charges. Operators, who read from a script, are trained to make purposefully deceptive and misleading representations about the programs, such as the relationship of the program to the consumer's prior purchase, the

programs' ostensible benefits, the consumer's ability to cancel their membership before being charged recurring fees, and the number of programs being offered. Consumers who are tricked into agreeing to the introductory trial are subsequently enrolled in and charged for a recurring monthly subscription to one or more Membership Programs.

5.      Following their enrollment, however, Sempris serially fails to send and consumers routinely fail to receive the written membership information and incentives promised during the call. Sempris purposefully delays or fails to send such materials. Accordingly, consumers are often completely unaware that their membership enrollment has been processed, and they are unable to either utilize any of the program's supposed benefits or cancel their trial memberships before being charged full membership fees.

6.      Additionally, contrary to the operator's representations, consumers who call and cancel their enrollment in the program continue to be charged, as Defendants lack adequate systems to process and ensure cancellations.

7.      Working together, Defendants have systematically defrauded consumers by deceptively enrolling and charging them for Membership Programs. Each Defendant is jointly and severally liable, and together, Defendants share in the profits generated by their fraudulent scheme.

8.      Plaintiff Herman is one of many consumers who have been injured by Defendants' conduct. Through his Complaint, Plaintiff seeks to put an end to Defendants' unlawful business practices and to recover the monies that have been wrongfully obtained from him and the Class Members.

**PARTIES**

9.      Plaintiff Eric Herman is a natural person domiciled in the State of Michigan.

10. Defendant Sempris, LLC, is a marketing services company that operates numerous "Membership Loyalty Programs," including the Budget Savers Membership Program. Sempris is a corporation incorporated and existing under the laws of the State of Delaware, with its principal place of business located at 11100 Wayzata Boulevard, Suite 680, Minneapolis, Minnesota. It does business throughout the United States, the State of Michigan, and this District. Until early 2011, Defendant Sempris operated under the corporate name Provell, Inc. On information and belief, Sempris also presently does business as ValusDirect, LLC.

11. Defendant Emson, Inc. manufactures, markets, and sells a wide range of consumer products, including products marketed "As Seen on TV," directly to consumers via television infomercials, websites, and other e-commerce means. Emson also sells its products wholesale to retailers, such as department stores and mass merchandisers. Emson is a corporation incorporated and existing under the laws of the State of New York with its principal place of business at 230 Fifth Avenue, New York, New York. Emson does business throughout the United States, the State of Michigan, and this District.

12. Defendant Quality Resources, Inc. is a marketing services provider that specializes in customer acquisition for subscription-based products, such as and including Sempris Membership Programs. Quality Resources is a corporation incorporated and existing under the laws of the State of Florida, with its principal place of business at 19321 C US Highway 19 N, Suite 200, Clearwater, FL. It does business throughout the United States, the State of Michigan, and this District.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative class, which is comprised of over 100

class members, is a citizen of a state different from Defendants, (b) the amount in controversy

exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that

subsection apply to this action.

14.     Venue is proper in this District under 28 U.S.C. § 1391(a) as Plaintiff is a resident

of this District and the injury arose here. Venue is additionally proper because Defendants

transact significant business in this District, including soliciting consumer business and entering

into consumer transactions.

**FACTS COMMON TO ALL COUNTS**

**Data Pass and Preacquired Account Marketing**

15.     Preacquired account marketing is a widespread and problematic practice whereby

a third party is given access to a consumer's private billing information by a business partner

who received this information through a prior, unrelated Internet or telephonic transaction. The

"merchant partner" who acquired the billing information then passes all or some of that

information onto (or otherwise makes it available to) the third party as part of a financial

arrangement wherein the original merchant is paid a fee. This sharing of consumer information is

commonly referred to as a "data pass."

16.     In a majority of instances, consumers do not consent to the sharing of their

information in this manner and are more often than not unaware that a merchant has transferred

their information to a third party.

17.     Following the data pass, consumers are commonly marketed and deceptively

enrolled in a membership program with a recurring monthly subscription. Any arguable benefits

that exist from the membership programs (in reality, there are essentially none) go unrealized

because the overwhelming majority of consumers are unaware they have been enrolled in these

clubs and/or programs in the first instance. And even those consumers who are able to access

program "benefits" only come to learn after the fact that they will need to spend hundreds if not thousands of dollars to realize any actual savings once the monthly membership fee is assessed. Third party sellers and their merchant partners, however, are completely aware of the deceptive nature of this business model and the legion of consumer complaints made directly to them as well as existing on the Internet.

**The Government Investigates and Bans Data Pass Practices**

18.     As a result of the deceptive nature of this type of marketing and the thousands of complaints voiced by consumers, the Senate Committee on Commerce, Science, and Transportation conducted an investigation of misleading e-commerce marketing practices in 2009, focusing its investigation on companies with the same business model as Sempris.

19.     In November 2009, the Committee released a staff report entitled "Aggressive Sales Tactics On the Internet and Their Impact On American Consumers." The report specifically described the process of "Data Pass" and "Preacquired Account Marketing," stating that the "this 'data pass' or 'card on file' process—where a third party company obtains a consumer's billing information not directly from the consumer, but from a website where the consumer has just made a purchase—is a well known and controversial practice" that has caused numerous consumer complaints and confusion.

20.     In response to the Senate Investigation, Congress passed the Restore Online Shoppers' Confidence Act ("ROSCA") in 2010.[1] Although ROSCA specifically targeted Internet based marketing (as opposed to those offers made over the phone), Section 8401 of ROSCA recognized the following:

---

[1]     Restore Online Shoppers' Confidence Act, 15 U.S.C.A. § 8401 *et. seq.*

(3) An investigation by the Senate Committee on Commerce, Science, and Transportation found abundant evidence that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy.

(4) The Committee showed that, in exchange for ''bounties'' and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as ''data pass''. These third party sellers in turn used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want.

21.     ROSCA banned the "data pass" process and required third-party sellers to both disclose all material terms of the transaction and obtain express informed consent from consumers, including the consumer's full account number and address, before charging their respective accounts.

**Sempris's Documented History of Deceptive Marketing**

22.     Like the companies named in the Senate Committee's Report, Defendant Sempris is a marketing company that offers subscription-based, negative-option "Membership Programs" purporting to offer discounts and services to "subscribing" consumers.

23.     However, despite costing membership fees of as much as $29.95 a month, these programs offer little real value and are rarely utilized by membership subscribers (many of whom are unaware that they have even been enrolled). Furthermore, the ostensible  "savings" or "coupons" offered under such programs go mostly untouched and instead, are listed merely to promote the appearance of legitimacy.

24.     Despite this fact (or perhaps due to it), Sempris has enrolled and continues to enroll hundreds of thousands of subscribers into its Sempris Membership Programs, including Budget Savers, and charges such consumers recurring membership fees.

25.     Sempris Membership Programs include, but are not limited to: Value Plus, Budget Savers, Cooking in Style, Essentials for Home, Explore USA, FunSource, Homeplay,

Pulse, and Vacation Passport. Sempris has also partnered with various merchants to create "Custom" Programs, such as: Glamour in You and Duets (for Frederick's of Hollywood), Chase Ultimate Rewards Plus (for Chase Manhattan Bank), and JC Whitney Buyers Plus (for JC Whitney). Consumers are enrolled in Sempris Membership Programs over the phone and online.

26.     Sempris has operated the same deceptive business practices for the past ten years. Previously operating as Provell, Inc., and before that, Damark International, Inc., Sempris's practice of fraudulently enrolling and charging consumers for its Membership Programs (as well as its propensity for changing its name to evade liability) has been well documented over the past decade. On information and belief, Sempris has additionally been operating under the name ValusDirect, LLC.

27.     Sempris's business practices previously resulted in an investigation and complaint filed against it by the Minnesota Attorney General in 1999, forcing Sempris (then operating as Damark International Inc.) to issue an official Assurance of Discontinuance.[2]

28.     Despite its Assurance of Discontinuance, Defendant changed its name to Provell, Inc. and resumed its deceptive business practices—namely, using preacquired information to deceptively enroll consumers in its Membership Programs.

29.     After operating as Provell for approximately a decade and accumulating thousands of consumer complaints under that name, Defendant changed its business name again, this time to Sempris.

30.     Ultimately, hundreds of consumer complaints about the deceptive nature of Sempris's Budget Savers membership enrollment and charges (spanning the course of several

---

[2]     Assurance of Discontinuance, *Minnesota ex rel. Hatch v. Damark Int'l, Inc.*, No. C8-99-10638 (Ramsey County Dist. Ct. Dec. 3, 1999).

years) can be found throughout the Internet on consumer protection websites.[3]

**Defendants Jointly Conspire to Deceptively Enroll and Charge Consumers**

31.     Emson and Quality Resources are co-conspirators in Sempris's enrollment scheme and have partnered with Sempris to design and jointly implement a system whereby consumers would be unknowingly and deceptively induced into enrolling in Sempris's Membership Programs. On information and belief, Emson and Quality Resources have worked with Sempris to craft scripts and "Q&A" responses designed to mislead consumers regarding the relationship between their Emson purchase and the membership program, the program's supposed benefits, the consumer's ability to cancel prior to the imposition of charges, and the number and nature of the program(s) they've been signed up for.

***Emson Acts as a Conduit for Passing Along Consumer Contact, Billing, and Order Information for Quality Resources and Sempris's Telemarketing Purposes.***

32.     As the initial point of consumer contact, Emson directly markets and sells its advertised products, such as the Chair Gym, over the television and Internet.

33.     To complete their online purchases, consumers are required to submit their private billing and contact information on the Emson website, including their telephone number, address, and email. At no point during the process does Emson disclose that the consumer's billing or contact information will be transferred to any other entity for marketing purposes. Nor are consumers required to view, check a box, or otherwise indicate their consent or acceptance to any terms and conditions or privacy policy governing their purchase. And to the extent any terms are displayed somewhere on Emson's website, such terms do not disclose that Emson will provide consumers' personal billing information to disreputable companies like Sempris. Rather,

---

[3]     *See,* e.g. http://www.complaintsboard.com/bycompany/budget-savers-a46060.html (listing more than 80 consumer complaints about Budget Savers); http://www.consumeraffairs.com/retail/budget-savers.html (listing 20 consumer complaints about Budget Savers.) Both sites last visited on August 20, 2013.

at most the consumer is notified—but never agrees—that their information may be disclosed to reputable companies—which Sempris certainly is not.

34. Unbeknownst to the consumer, however, and in breach of any supposed privacy policy or other terms and conditions, Emson and/or an agent acting on Emson's behalf immediately transfers or makes available the consumer's private information to Quality Resources (a third party telemarketer) and/or Sempris upon receipt. The transferred or made available information includes the consumer's full name, telephone number, e-mail, and address, as well as details regarding the consumer's Emson order, including partial billing information.

***Under the Pretense of Verifying the Consumer's Emson Order, Quality Resources Places Telemarketing Calls to Consumers and Markets Sempris Membership Programs.***

35. Upon receiving the consumer's information, a Quality Resources telemarketer contacts the consumer using the telephone number he/she recently provided to Emson. The call, which takes place within days (if not hours) of the consumer's Emson order, is falsely presented as being made for the purposes of verifying or confirming the details of the consumer's purchase of an Emson product. The caller specifically indicates the call is to "make certain everything was covered with you today" related to the prior purchase and that the call is for "quality assurance" and "consumer protection" purposes.

36. The Quality Resources telemarketer refers to the specific Emson product that the consumer ordered by name and goes through order information, such as the consumer's address and contact information, before assuring the consumer that the order will be arriving shortly. This is designed again to make the consumer believe the call is actually connected to his or her prior purchase. In reality, the call has no effect or relation to the Emson order, which has already been completed online. Such statements are merely included so as to trick the consumer into believing the call is connected to his or her prior purchase.

37.     Not only is Emson aware that Quality Resources uses its orders as a pretext for calling consumers, it actively encourages and participates in the deception by providing Quality Resources with the consumer's order details—an act that contributes to consumer confusion about the nature of the telemarketing call and allows Quality Resources to gain the consumer's trust and attention. On information and belief, Emson and Quality Resources profit each time a consumer is deceptively enrolled into Budget Savers.

38.     Further, even when the telemarketer states that he/she is calling from Quality Resources, such a distinction is meaningless to the consumer, as the consumer has no prior knowledge of or relationship with the named entity. Rather, the telemarketer quickly refers to the consumer's order and states that the call is recorded for "consumer protection" and "quality assurance" purposes, leading consumers to reasonably believe that the call is related to their prior Emson purchase. At no point in the call is Sempris ever mentioned by name at all.

***Quality Resources Follows a Purposefully Deceptive Marketing Script Designed to Trick Consumers Into Enrolling.***

39.     After creating the impression that the phone call is related to the consumer's Emson order—and thereby assuring that the consumer will stay on the line and not hang up the phone—Quality Resources launches into one or more scripted marketing pitches to sell membership programs offered by Defendant Sempris and other entities.

40.     Telemarketers are trained to make purposefully deceptive and misleading representations about the program. These include false statements and material omissions regarding the terms of the programs, such as the nature of the program "benefits", when trial periods end, the consumer's ability to review written membership materials and cancel membership before being charged recurring fees, the availability of low-cost introductory offers and gift cards or gas vouchers, and the number of different programs that the consumer is being

signed up for.

41.     Telemarketers are further trained to deflect consumer questions about the nature of each program offer, its relationship to the consumer's Emson order, and each program's corresponding terms and conditions, with scripted and evasive answers. When consumers specifically ask about whether membership offers are related to or a requirement for their Emson order, rather than answer the question, the operator deflects and states that "everything" will be sent to consumers "in the mail in writing to review" and that they can cancel at any time.

42.     In reality, the timing and wording of the offers are purposefully designed to obscure material terms, confuse callers with "free" trials and other gifts, and induce consumers to consent to enrollment, all while obscuring and/or concealing the fact that the membership programs are negative option services that will automatically and perpetually be billed to a consumer's account until they call to cancel.

43.     To add to consumer confusion, Quality Resources purposefully pitches several membership programs during the same call, bundling or combining offers for Sempris Membership Programs with those offered by other third parties. Each offer is similarly scripted to include: (1) a low-cost trial period and gift cards or vouchers as incentives to join followed by recurring charges, (2) a promise that written membership information will be sent to the consumer through the mail for review, and (3) a promise that the consumers can cancel "at any time" by calling a toll-free number (which is very similar to the cancellation numbers provided for the other programs such that consumers are not aware that different numbers must be used to cancel each program), which the consumer is never told to write down, to avoid being charged. The similarity of the offers' terms confuses consumers into thinking they are actually the same program and offered by the same entity.

44.     As Quality Resources is paid a commission for each consumer they enroll, they are further incentivized to misrepresent or omit material terms of the membership programs so as to induce enrollment.

45.     At no point is the involvement of Sempris or any other third party ever disclosed—again leading consumers to believe that the marketed programs are offered by Emson (the same entity behind their previously referenced order).

46.     Quality Resources likewise refers back to the consumer's Emson purchase during each pitch, asking the consumer to repeat the specific credit or debit card number that he/she used for their Emson purchase for "confirmation" purposes and further misleading consumers as to the purpose and entity behind the call. To prompt consumers to refer back to the card, Quality Resources recites specific card details, such as the first or last four digits of the card number and/or credit card merchant. By demonstrating that it is already in possession of the consumer's private billing information, consumers are again led to believe that they are still dealing with Emson (the only entity the consumer had previously provided their information to) or that the offer they are being told about is connected with that prior purchase.

47.     After being presented with more than one membership offers (each intentionally designed to create confusion as to the price, terms, source, and benefits of the program), consumers are induced into saying "okay" to trying out one or more trial memberships.

48.     After deceptively obtaining such consumer "consent," Quality Resources transfers the consumer's billing and contact information to Sempris for processing, and the consumer is subsequently enrolled into and charged for the program(s) by Sempris.

***Sempris Denies Consumers Any Meaningful Opportunity to Use or Cancel Their Membership Before Being Charged Recurring Fees.***

49.     Sempris is aware of the deceptive representations used by Quality Resources to

enroll consumers. Sempris accesses and reviews audio-recordings of the enrollment phone calls provided by Quality Resources. Further, on information and belief, Sempris specifically drafts certain deceptive terms, such as those delineating the programs' trial periods and promised enrollment incentives, and requires Quality Resources to include such terms in its sales pitches.

50.     After receiving the consumer's information from Quality Resources, Sempris immediately bills the $1 introductory fee to the consumer's account and begins calculating the membership trial period (usually 14 days). Rather than promptly send written membership materials to the consumer as promised (including the information necessary for the consumer to utilize program benefits and further instructions on how to cancel before being charged), however, Sempris serially delays or completely fails to send the materials altogether. Accordingly, consumers are often completely unaware that their membership has been processed or effectuated and are denied any meaningful opportunity to try out the program's supposed benefits or cancel membership before the expiration of their trial period and the start of recurring charges. On information and belief, Sempris sends its written membership materials, if at all, in nondescript envelopes designed to appear like junk mail, in the hopes that the consumer throws it away without ever opening it.

51.     Further, consumers who call and cancel during or after their trial periods often continue to be billed recurring membership fees. In some cases, Sempris discontinues or freezes membership charges for a short period (so as to deceive consumers into thinking that their cancellation had been processed) before resuming the imposition of recurring fees.

52.     Additionally, Sempris serially fails to deliver the gift cards, gas vouchers or other promised gifts to consumers as incentives for enrollment, or provide consumers with further information on how to receive the promised gifts.

53.     Defendants are jointly liable, and together, share in the profits generated by their fraudulent scheme.

## FACTS SPECIFIC TO PLAINTIFF ERIC HERMAN

54.     On or around April 25, 2012, Eric Herman viewed a television infomercial for one of Defendant Emson's exercise and fitness products—the Chair Gym. After viewing the infomercial, Herman went to Emson's Chair Gym website (www.chairgym.com) to place his order.

55.     Plaintiff followed the website's instructions on how to order the Chair Gym and entered his personal billing and contact information to complete his purchase. Specifically, Plaintiff was required to provide Emson his e-mail address, telephone number, credit or debit card information, and billing address.

56.     At no point during the transaction did Emson clearly disclose that it would be sharing his information with any third party or obtain Herman's consent to share such information. Likewise, Emson failed to disclose that it would share his information with or make it available to any disreputable third party like Sempris. Nor was Plaintiff required to view or consent to any "Privacy Policy" or "Terms and Conditions" as a condition of his purchase. Emson likewise did not indicate that there would be any type of follow up or confirmation phone call as a result of the purchase.

57.     In reliance upon Emson's failure to disclose its information sharing policies, and believing that his private information would be protected from disclosure, Plaintiff submitted the requested information and completed his Chair Gym purchase. Had he known that Emson would thereafter share his private information with Quality Resources for telemarketing purposes, he would not have placed his Emson order.

58.     The next day, on April 26th, 2012, Plaintiff received a telephone call on his cell phone from the number 1-866 379-2003. The caller indicated that the call was to verify Plaintiff's Chair Gym order and referred to both Plaintiff and the product by name.

59.     Believing the call to be related to his Emson order, Plaintiff agreed to stay on the line. The caller then proceeded to go over the details of Plaintiff's Chair Gym order, including the billing and shipping information associated with the order.

60.     After confirming the details of the order, the caller asked Herman to stay on hold so that he could be transferred to another operator to receive "membership" information.

61.     Herman told the caller that he was not aware of or interested in any membership and only wanted to purchase the Chair Gym. The caller then informed Herman that she could not process the purchase of the Chair Gym without sending him to the next operator. Because he believed that it necessary for his purchase of the Chair Gym, Herman agreed to hold for the next operator. After a few moments, he was connected to another live representative, who introduced herself as "Sandra" from "Quality Resources."

62.     Plaintiff was not aware of who Quality Resources was and believed that he was still speaking with a representative from the Chair Gym.

63.     The telemarketer thanked Herman for holding and informed him that she needed just "a brief moment to make certain everything was covered with [him]" and further, that the rest of the call would be recorded for "quality assurance" and "consumer protection" purposes. She then recited Plaintiff's Chair Gym order details (like the first operator had done), including Plaintiff's full address and phone number, after which she stated that "All right. Your Chair Gym will arrive out to you shortly. Just keep your eye out." Given these statements, Herman (mis)believed that the call was related to his Emson purchase.

64.     In the same breath, Sandra immediately launched into a telemarketing pitch for

Sempris's Budget Savers membership program, beginning with the confusing statement that "In

addition to [sic] Budget Savers discount savings program, the $100 gasoline voucher will arrive

to you soon." Without pause, she then quickly recited the rest of the scripted offer, stating that:

> Budget Savers will automatically bill just a dollar intro. fee to Mastercard ending
> 6322 within one to five days, after the first 14 days, unless you call and cancel
> [and] will automatically bill the membership fee, $29.95, same time each month,
> same card. And you can cancel at any time for any reason. That toll-free number
> is going to be right in the packet for you, but its 800-475-1942. The $100 in gas
> vouchers are yours to keep no matter what. So with your approval, you'll be billed
> under the terms I just described. But I'll send your membership materials in the
> mail in writing to you to enjoy. Okay?

65.     Based on the telemarketer's confusing representations, Plaintiff reasonably

believed that he was being offered a $1 introductory trial to a program related to his prior Emson

purchase and that he could call and cancel before being charged any further fees using the

information that was to be sent to him in writing. Thus, in reliance upon the telemarketer's

misrepresentations about the nature and terms of the program (including that he would not be

billed until the end of his introductory period, that he could call and cancel using the phone

number "right in the packet for you", and that he would receive $100 in gas vouchers to keep), as

well as the first operator's representations that he had to agree to the program to process his

Chair Gym order, Plaintiff replied "okay."

66.     Plaintiff was not aware that he was consenting to enrollment in a negative-option

program that was offered by a third party (Sempris) and in no way related to his Chair Gym

order. Likewise Plaintiff was not aware that Sempris would fail to send him his written

membership materials or the promised $100 in gasoline vouchers, or that he would continue to

be charged even after he called to cancel.

67.     After receiving his "okay", the telemarketer claimed that "it shows when you placed the order for the Chair Gym you submitted your Mastercard, ending in 6322" and that, "for security purposes," she needed him to "read the same numbers back just to confirm Budget Savers." Herman thereafter repeated the card number and expiration date for the debit card he had previously used for his Emson purchase.

68.     After completing the pitch for Budget Savers, the telemarketer asked Plaintiff to "keep [his card] handy for a minute" because she was "supposed to re-confirm it one more time."

69.     The telemarketer next asked Plaintiff to enter the numbers for his month and day of his birthday on his phone keypad for "confirmation." He complied, after which the telemarketer stated that the number "came through perfect." However, Plaintiff had never previously disclosed his birthday to Emson, Quality Resources, or Sempris.

70.     Instead, the telemarketer used Plaintiff's birthday information as a segue into pitching another, different but similar-sounding membership program—Shoppers Advantage— which contained confusingly similar terms, such as a $1 introductory period, the ability to call and cancel, and incentives for trial enrollment. For instance, when pitching Shoppers Advantage, the telemarketer used a similar script which stated:

> Shoppers Advantage will bill just a $1 intro. fee [to] the card you provided today within three to five days after the first 30 days, unless you call and cancel. Shoppers Advantage automatically bills the current monthly membership fee, which is now only $21.95, about the same time each month, the same card, without you having to do anything further.

71.     Because of the similar terms between the two programs and the way they are presented back-to-back to the consumer, Plaintiff reasonably believed that the two offers were actually a part of one program and that the telemarketer was merely providing additional information about Budget Savers. Plaintiff likewise believed that the price terms for Budget

Savers had dropped, because the telemarketer stated that the monthly membership fee "*is now only $21.95.*"

72.     Believing that he was simply reconfirming his trial membership, Plaintiff said "okay" in response to the telemarketer's offer of Shoppers Advantage.

73.     However, before reconfirming his bank card information, Herman again inquired as to whether the program was necessary to complete his Chair Gym purchase. Specifically, Herman asked "if I choose not to start the Shoppers Advantage right now, is that fine, or do I have to do that in order to continue with the [Chair Gym] shipment?"

74.     In response, the telemarketer deflected answering the question and responded with: "We just get it to you in the mail in writing to review. The best part, your $25 American Express gift check, it's yours to use for staying with the service offer. So again, there is no obligation to stay with the service because you can cancel at any time for any reason."

75.     The telemarketer's refusal to provide a clear answer as to whether Plaintiff was required to sign up for the programs in order to receive his Chair Gym order—and deflection by stating that the information would be sent to him in writing for his review and that he could cancel at any time—was a scripted response designed to confuse Plaintiff and other consumers. By deflecting Plaintiff's question with the assertion that all materials would be provided in writing and reaffirming that he could cancel at any time, the telemarketer intentionally gave the false impression that no recurring monthly charges would occur unless and until Plaintiff had received the materials in writing and that he could cancel before being charged any recurring fees. The telemarketer's statements, part of a standard, scripted "Q&A", purposefully omitted any real response to Plaintiff's questions and similarly, again indicated that the membership programs were a requirement for his Chair Gym purchase.

76.     In reliance upon the telemarketer's representations that the enrollment in the membership programs were necessary for his Chair Gym purchase and that he could call and cancel at any time to avoid being charged recurring fees, Herman said okay to trying the offered programs (which he believed were one). Had Herman known that the membership programs were not required for his Chair Gym purchase, and that he would thereafter be charged after cancellation, he would not have said "okay" to trial enrollment in the programs.

77.     Herman thereafter repeated his billing and bankcard information to "confirm" his "authorization" for the Shoppers Advantage program. The telemarketer then concluded the call by referring back to Plaintiff's Chair Gym order, stating that: "Great. Enjoy your savings and definitely enjoy your order from Chair Gym. And you have a wonderful day." This statement was again designed to confuse Herman regarding the purpose of the call and its relationship to his prior Emson purchase.

78.     A few days later, Herman called the numbers provided by the operator and canceled his membership.

79.     Nevertheless, he received a $1.00 charge for Sempris's Budget Savers program on April 30, 2012. Two weeks later, on May 14, 2012, he received a $29.95 charge for Budget Savers debited to his bank account.

80.     After seeing the May 14th charge on his statement (and having not received any printed membership information in the mail), Herman called the number provided by the telemarketer to ask why he had been charged. The customer service representative with whom he spoke informed him that there was no record of his prior cancellation. Herman again requested cancellation of his membership, and the representative assured him that his membership was

cancelled. The representative, however, refused to provide a confirmation number for the cancellation and ended the call when Herman asked for her name.

81.     Herman was not charged the following month. However, two months later on July 17, 2012, another Budget Savers charge for $29.95 appeared on Herman's statement. This time, the charge overdrew Herman's account. As a result, Herman was charged an overdraft fee of $29.00. As his account was overdrawn, the bank temporarily suspended Herman's ability to transfer money into his checking account from a separate loan account he held for emergency purposes. Accordingly, the two authorized transactions following the unauthorized Budget Savers charge similarly resulted in overdraft fees of $29.00 each. Had it not been for the Budget Savers charge, Herman would have been able to transfer money into his checking account and would not have been overdrawn for any of his authorized transactions.

82.     As the months wore on, Herman had misplaced the telephone numbers provided by the telemarketer. Thus, as he still had not received any of the promised membership information in the mail, Herman contacted his bank to ask for contact information relating to the Budget Savers charge. Herman then called Budget Savers using the number he received from the bank. The customer service representative who answered again assured Herman that his membership was now cancelled and promised that he would receive a refund for the July transaction. When Herman asked about a refund of the three overdraft charges, the customer service representative promptly disconnected the call.

83.     A few weeks later, Herman received a refund of his $1 introductory fee as well as his May and July membership charges.

84.     Herman never received any printed materials pertaining to his membership enrollment, such as confirmation of enrollment, a membership identification number (necessary

to utilize the program's supposed benefits), or any of the promised gift cards or rebates.

Accordingly, Herman was unable to (and never did) utilize any of the program's supposed

benefits.

85.     After weeks of waiting for the Chair Gym, Herman finally received a postcard in

the mail stating that the product was not available. The post card invited Herman to either wait

for the product or cancel the order by completing the postcard and mailing it back. Herman

subsequently filled out and returned the postcard to cancel his order.

## CLASS ALLEGATIONS

86.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2)

and Rule 23(b)(3) on behalf of himself and a Class and three Subclasses defined as follows:

**Sempris Class:** All individuals who were enrolled by Quality Resources in a
Sempris Membership Program using the same script to enroll Eric Herman
following their online purchase of at least one Emson product.

**TCPA Subclass**: All Sempris Class Members who received telephone calls from
Quality Resources on their cellular telephones who never provided their express
consent to receive such calls.

**Michigan Subclass**: All Sempris Class Members who reside in Michigan.

**Debit Card Subclass**: All Sempris Class Members who had monthly fees for
Membership Programs debited directly from their bank account by Sempris.

The following persons are excluded from the Class and Subclasses: 1) any Judge
or Magistrate presiding over this action and members of their families; 2)
Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any
entity in which Defendants or their parents have a controlling interest and their
current or former employees, officers and directors; 3) persons who properly
execute and file a timely request for exclusion from the class; and 4) the legal
representatives, successors or assigns of any such excluded persons.

87.     **Numerosity:** The exact number of the members of the Classes is unknown and

not available to Plaintiff at this time, but it is clear that individual joinder is impracticable.

Defendants have deceived thousands of consumers who fall into the definition set forth above.

Members of the Classes can be identified through Defendants' records, including their electronic records and databases.

88.     **Commonality:** There are many questions of law and fact common to the claims of Plaintiff and the Classes that this litigation can answer in a single stroke. Common questions for the Classes include but are not limited to the following:

a.  Whether Defendants' conduct alleged herein violates the Michigan Consumer Protection Act, M.C.L § 445.903 *et seq*.;

b.  Whether Defendants' conduct alleged herein violates 15 U.S.C § 1693e, *et seq*,;

c.  Whether Defendants' conduct alleged herein constitutes breach of contract;

d.  Whether Defendants' conduct alleged herein constitutes unjust enrichment;

e.  Whether Defendants' conduct alleged herein constitutes fraud by omission;

f.  Whether Defendants' conduct alleged herein fraudulent inducement;

g.  Whether Defendants' conduct constitutes a violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*,;

h.  Whether Defendants received prior express consent from Plaintiff and the TCPA Subclass to be called on their cellphones; and

i.  Whether Defendants used standardized scripts and responses such that substantially the same false representations and material omissions were made to each member of the Classes.

89.     **Typicality:**  Plaintiff's claims are typical of the claims of other members of the Classes, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendants based upon the same transactions which were made uniformly with Plaintiff and the public.

90. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Classes and Defendants have no defenses unique to Plaintiff.

91. **Predominance and Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Classes to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured. Furthermore, there are no individualized issues that predominate over the common ones. Each member of the Classes was subjected to substantially the same false representations and material omissions, including that: (1) the call was related to the consumer's prior purchase, (2) the program offered savings and supposed benefits, (3) the consumer would be able to cancel using written membership materials, and (4) free gifts would also be arriving in the mail. Likewise, with respect to every Class member Defendants bundled offers so as to confuse consumers regarding their ability to cancel.

<u>COUNT I</u>
**Violation of the Michigan Consumer Protection Act**
**(M.C.L § 445.903 *et seq*.)**
**(Individually and on behalf of the Michigan Subclass)**

92.    Plaintiff incorporates by reference the foregoing allegations.

93.    Defendants' wrongful acts, as set forth throughout this Complaint, constitute unfair, unconscionable or deceptive methods, acts or practices in violation of the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.903.

94.    Specifically, Defendants violated § 445.903(a) by "causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services."

95.    By calling Plaintiff and the Subclass under the premise of verifying their Emson order details, Defendants caused Plaintiff and the Subclass to reasonably believe that both products and services were provided by the same source.

96.    Specifically, Emson acted in a deceptive manner by transferring or making available consumers' private billing, contact, and order information to Defendant Quality Resources and allowing Quality Resources to use such information in its telemarketing calls. Quality Resources acted in a deceptive manner by using consumers' private billing, contact, and order information in its telemarketing calls, and further, by failing to clearly disclose that its marketed membership programs were offered by a third party and not the entity behind the consumer's Emson order. Sempris acted in a deceptive manner by allowing and/or requiring Quality Resources to conceal its involvement with the marketed membership program offers.

97.    Further, Sempris and Quality Resources violated § 445.903(r) by "representing that a consumer will receive goods or services 'free', 'without charge', or words of similar import without clearly and conspicuously disclosing with equal prominence in immediate

conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised."

98.     Quality Resources, using the script approved by Sempris, represented to Plaintiff and the Subclass that they would receive gift cards and/or rebates, such as a $100 gasoline voucher, in exchange for agreeing to trial enrollment in a Sempris Membership Program. In further accordance with the script, Quality Resources further represented that such complimentary gifts would "arrive to [Plaintiff and the Subclass] soon" and would be theirs "to keep no matter what." Quality Resources failed to disclose "with equal prominence" any additional steps that would be required in order for the consumer to receive or use the complimentary gifts, and further, failed to conspicuously disclose that agreeing to a trial enrollment would lead to recurring monthly fees that would automatically be charged to consumers' accounts.

99.     Sempris is aware of the deceptive representations made by Quality Resources, as described above, and participated in the drafting of such representations by providing information relating to the complimentary gifts to be advertised in conjunction with its Membership Programs. Sempris further failed to require and/or prohibited Quality Resources from disclosing the steps the consumer would need to take to receive or use the advertised gifts. Additionally, Sempris purposefully made it difficult or confusing for consumers to receive their promised gifts by including prerequisites and conditions to receiving the gifts that were not disclosed to consumers during their enrollment.

100.     Defendants Emson and Quality Resources also violated § 445.903(s) by "failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."

101.    Defendant Emson concealed from and failed to disclose to Plaintiff and Subclass members that (1) it would share their private billing, contact, and order information with disreputable third parties, including Defendants Quality Resources and Sempris and (2) that Quality Resources would thereafter use such information to initiate telemarketing calls to consumers.

102.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to purchase one of Emson's advertised products and provide Emson with access to their billing and contact information.

103.    Defendant Quality Resources concealed from and failed to disclose to Plaintiff and Class that:

(1)    its telemarketing calls were not necessary to verify or process consumers' Emson orders;

(2)    it is a third party telemarketer and not an agent or employee of Emson;

(3)    consumers would have no meaningful opportunity to try out program benefits, review written membership materials, or call and cancel membership before monthly recurring charges would be assessed;

(4)    consumers were unlikely to ever receive any of the gift cards, vouchers, and/or rebates that were promised as incentives for consumers to agree to try the marketed membership programs;

(5)    the true costs of its marketed membership programs (recurring monthly fees that would automatically and perpetually be billed unless the consumer affirmatively called to cancel), including the fact that Plaintiff's and the Class's accounts would be continually charged unless such consumers took affirmative action to avoid the charges, the date(s) the funds

would be deducted, and the specific steps necessary to avoid the charges; and

(6)     that its marketed membership programs were actually offered and
operated by Sempris and other third parties.

104.     These omitted and concealed facts are material because they were likely to
influence a consumer's decision of whether or not to agree to the trial memberships marketed by
Quality Resources and provide Quality Resources with confirmation of their billing and contact
information.

105.     Plaintiff and the Subclass were deceived and/or misled by Defendants' omission
of these material facts, and suffered harm in the form of recurring membership fees charged by
Sempris. Further, Defendants' omitted material facts could not have been reasonably known or
discovered by consumers.

106.     Defendant Quality Resources further violated § 445.903(cc) by "failing to reveal
facts that are material to the transaction in light of representations of fact made in a positive
manner."

107.     Quality Resources failed to reveal that consumers were unlikely to receive any of
the printed membership materials for review, and thus, would not be able to try membership
benefits or review membership information before monthly recurring charges would be assessed.
Quality Resources further failed to reveal that consumers were unlikely to receive the gift cards
and/or vouchers, such as the $100 gasoline voucher, promised as incentive for trial enrollment,
and that consumers were likely to be charged for membership even after calling to cancel.
Rather, Quality Resources purposefully emphasized that membership materials and gifts would
"arrive out to [consumers] soon" and would be sent "in the mail in writing [for consumers] to
enjoy", and further, that consumers could "cancel at any time for any reason." The fact that

membership materials and gifts were unlikely to be received, and that consumers were likely to be charged fees even after cancellation, were especially material to the transaction in light of the representations that consumers would have an opportunity to review membership materials, would receive gifts for agreeing to trial enrollment, and would be able to cancel at any time.

108.     Finally, Defendants violated § 445.903(bb) by "making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."

109.     Defendant Quality Resources represents, at Sempris's direction, that the sales pitch is to verify consumers' Emson orders and is actually for "quality assurance" "consumer protection purposes." This is wholly false, as the transaction is for the purpose of preying upon consumers. Such statements, combined with the use of the consumer's credit or debit card information, leads the consumer to reasonably—though falsely—believe that the call is related to their prior Emson purchase when in fact it is not.  Defendants Emson and Quality Resources falsely represented to Plaintiff that they would be unable to process his Chair Gym order without his agreement to try Sempris's Membership Program. This statement of fact was material to the transaction because it was a deciding factor in Plaintiff's decision to consent to trial enrollment. Further, this statement represented or suggested the state of affairs to be something other than what it actually was (that trying the membership program was a pre-requisite for purchase of the Chair Gym).

110.     As a direct and proximate result of the unfair, unconscionable, or deceptive practices of Defendants as set forth above, Plaintiff and the Subclass have suffered actual damages in the form of recurring monthly fees charged for the Sempris Membership Programs.

111.    Plaintiff and the Subclass seek actual damages for Defendants' unfair and unlawful practices pursuant to M.C.L. § 445.911(3) and an order enjoining Defendants from engaging in future unfair and unlawful practices pursuant to M.C.L. § 445.911(2), plus interest and attorneys' fees in an amount to be determined at trial.

## COUNT II
**Violations of the Electronic Funds Transfer Act
(15 U.S.C § 1693e)
(As against Defendant Sempris)
(Individually and on behalf of the Debit Card Subclass)**

112.    Plaintiff incorporates by reference the foregoing allegations.

113.    The Electronic Funds Transfer Act ("EFTA") regulates electronic payments directly debited from consumer bank accounts and was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." The primary objective of EFTA is "the provision of individual consumer rights." 15 U.S.C. § 1693.

114.    Under § 1693(e) of EFTA, "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." EFTA further defines the term "preauthorized electronic fund transfer" to mean "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a.

115.    As described herein, Sempris attempted to enter into a preauthorized electronic transfer agreement with Plaintiff and the Debit Card Subclass so as to debit Plaintiff's and the Debit Card Subclass's bank accounts for membership program fees on a monthly basis.

116.    Sempris thereafter initiated electronic transfers of funds for membership fees from the bank accounts of Plaintiff and the Debit Card Subclass on a recurring basis, at substantially

regular intervals. Sempris, however, did so without first obtaining written authorization from them or providing them with a copy of any such purported authorization.

117.    Therefore, Sempris has violated 15 U.S.C. § 1693e.

118.    Plaintiff and the other members of the Subclass have suffered damages as a result of Sempris's violation of 15 U.S.C. § 1693e.

119.    Accordingly, under 15 U.S.C. § 1693m, Plaintiff and the other members of the Subclass seek actual damages, statutory damages, reasonable costs and attorneys' fees, and an injunction against further violations.

<u>**COUNT III**</u>
**Fraud by Omission**
**(As against Defendants Emson and Quality Resources)**
**(By Plaintiff individually and on behalf of the Class)**

120.    Plaintiff incorporates by reference the foregoing allegations.

121.    Based on Emson and Quality Resources's material omissions, Plaintiff and members of the Class did not reasonably expect to be enrolled in and charged by Sempris for its Membership Programs without authorization and after cancellation of their memberships.

122.    Defendant Emson concealed from and failed to disclose to Plaintiff and Class members that (1) it would share their private billing, contact, and order information with disreputable third parties, including Defendants Quality Resources and Sempris and (2) that Quality Resources would thereafter use such information to initiate telemarketing calls to consumers.

123.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to purchase one of Emson's advertised products and provide Emson with access to their billing and contact information.

124.    Emson's concealment and omission of these material facts contributed to Plaintiff and Class members' confusion regarding the source and sponsorship behind the telemarketing calls they received from Quality Resources as well as the source and sponsorship behind the Sempris Membership Programs that they were deceptively enrolled in.

125.    Although Emson was aware that its concealment of these material facts would lead Plaintiff and the Class to believe that the telemarketing calls and membership programs were offered and/or endorsed by it, and that Quality Resources would use the contact, billing, and order information it provided to deceptively telemarket to its customers, it did nothing to prevent or correct Plaintiff and Class members' misapprehension of such facts, which led to Plaintiff and Class members being deceptively enrolled in and charged for Sempris Membership Programs.

126.    Plaintiff and Class members relied on Emson's concealment and omission of these material facts and provided their billing and contact information to Emson to complete their Emson purchases.

127.    Defendant Quality Resources concealed from and failed to disclose to Plaintiff and Class that:

(1)    its telemarketing calls were not necessary to verify consumers' Emson orders;

(2)    it is a third party telemarketer and not an agent or employee of Emson;

(3)    consumers would have no meaningful opportunity to try out program benefits, review written membership materials, or call and cancel membership before monthly recurring charges would be assessed;

(4)    consumers were unlikely to ever receive any of the gift cards, vouchers,

and/or rebates that were promised as incentives for consumers to agree to try the marketed

membership programs;

(5)     the true costs of its marketed membership programs (recurring monthly

fees that would automatically and perpetually be billed unless the consumer affirmatively called

to cancel), including the fact that Plaintiff's and the Class's accounts would be continually

charged unless such consumers took affirmative action to avoid the charges, the date(s) the funds

would be deducted, and the specific steps necessary to avoid the charges;

(6)     that consumers who cancelled their memberships would thereafter still be

charged; and

(7)     that its marketed membership programs were actually offered and

operated by Sempris and other third parties.

128.    These omitted and concealed facts are material because they were likely to

influence a consumer's decision of whether or not to agree to the trial memberships marketed by

Quality Resources and provide Quality Resources with confirmation of their billing and contact

information.

129.    Quality Resources's intentional concealment and omission of these material facts

contributed to Plaintiff and Class members' confusion regarding the relationship between the

telemarketing calls they received from Quality Resources and their Emson order, the terms of

Sempris Membership Programs, and the entity behind its marketed membership programs.

Quality Resources's concealment and omission of these material facts further caused Plaintiff

and Class members to believe that they could call and cancel their memberships at any time to

avoid being charged recurring monthly membership fees, that they would be sent membership

materials and gifts in the mail and would have the opportunity to review the materials and keep

the gifts, and led to Plaintiff and Class members agreeing to enroll in its marketed membership programs.

130.    Although Quality Resources was aware that its concealment of these material facts would lead Plaintiff and the Class to believe that (1) the telemarketing calls and membership programs were offered and/or endorsed by Emson, (2) that they would timely receive written membership materials in the mail, and (3) that they would have the opportunity to review such materials and call to cancel before being charged recurring monthly fees, it did nothing to prevent or correct Plaintiff and Class members' misapprehension of such facts, which led to Plaintiff and Class members being enrolled in and charged for Sempris Membership Programs.

131.    Plaintiff and Class members relied upon the concealment and omissions described in Paragraph 127 to their detriment. Specifically, Plaintiff and the Class relied upon Quality Resources' concealment and omission of its identity as a third party telemarketer, as well as its concealment and omission of the telemarketing calls' purpose and relationship to consumers' Emson orders, by staying on the phone and listening to Quality Resources' marketing pitches. Plaintiff and the Class further relied upon Quality Resources' concealment and omission of the facts surrounding membership enrollment (specifically those relating to the receipt of membership materials and promised incentives, as well as the ability to try out membership benefits before being charged recurring fees and call and cancel at any time) by agreeing to trial enrollment in the advertised membership programs.

132.    Defendants were further under a duty to speak. Plaintiff made a specific inquiry regarding the relationship between his Emson Chair Gym order and the advertised membership programs. For instance, when Herman specifically asked if he had to agree to the programs "in

order to continue with the [Chair Gym] shipment", Quality Resources responded to the inquiry with the misleading deflection that membership materials would get to him "in the mail in writing to review" and that there was "no obligation to stay with the service."

133.    Plaintiff and the Class justifiably relied on the omissions of Emson and Quality Resources to their detriment.

134.    The detriment is evident from the unauthorized charges placed on Plaintiff's and Class members' accounts and the monies lost.

135.    As a direct and proximate result of Emson and Quality Resources's misconduct, Plaintiff and the Class have suffered and will continue to suffer actual damages in the form of monies taken by Sempris.

### COUNT IV
**Fraudulent Inducement**
**(As against Defendants Quality Resources and Sempris)**
**(By Plaintiff individually and on behalf of the Class)**

136.    Plaintiff incorporates by reference the foregoing allegations.

137.    As described with particularity herein, Quality Resources and Sempris intentionally made telemarketing offers that they knew or should reasonably have known were false and misleading so as to fraudulently induce enrollment into Sempris Membership Programs. This conduct includes, but is not limited to:

(1)    promoting and advertising Sempris Membership Programs while concealing the actual cost and terms of membership, material portions of any transaction,

(2)    initiating telemarketing calls to consumers under the guise of verifying their Emson orders,

(3)    stating and/or implying that agreeing to trial enrollment in the membership programs were necessary to complete or process consumers' Emson orders, and

(4)     claiming that consumers would cancel their Sempris Membership Programs at any time to avoid recurring monthly membership charges.

138.    Specifically, during its telemarketing calls to Plaintiff and Class members, Quality Resources misrepresented:

(1)     the purpose of the call as being connected to the consumer's purchase of an Emson product and for "quality assurance" "consumer protection purposes",

(2)     that the programs were offered by Emson and were related to the consumer's Emson order when they were actually offered by Sempris, whose identity is never disclosed;

(3)     that agreeing to trial enrollment in the Sempris Membership Program was necessary to process or complete Plaintiff and the Class members' Emson orders;

(4)     the timing for when membership trial periods would begin and end, and when monthly membership charges would begin as well as the ability of consumers to receive review printed membership materials so as to sample program benefits or cancel before the expiration of their trial periods and the commencement of recurring monthly charges;

(5)     that consumers would be able call and cancel membership before monthly recurring charges would be assessed using the written membership information that was to be sent "in the mail", "in writing", for consumers "to enjoy"; and

(6)     that consumers would "soon" receive the gift cards, vouchers, and/or rebates promised as incentives for trying the marketed membership programs.

139.    Quality Resources further intentionally made misleading representations regarding the program's actual terms and costs, including:

(1)     emphasizing that the introductory fee was only $1,

(2)     obscuring and/or concealing the actual $29.95 monthly membership fee,

(3)     obscuring and/or concealing the automatic and negative-option nature of the billed membership fees,

(4)     obscuring and/or concealing the procedures and obligations for cancellation, including the time period during which consumers could cancel without being charged,

(5)     obscuring and/or concealing the procedures for obtaining gas vouchers or other supposed "free" gifts, and

(6)     obscuring and/or concealing when the introductory period would start and end.

140.    Quality Resources intentionally designed their membership scripts and pitches, with Sempris's help as a co-conspirator, to be difficult to understand and likely to mislead the reasonable consumer, and were in fact confusing to the reasonable consumer.

141.    The price of a consumer product or service is a material term of any transaction because it directly affects a consumer's choice or, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a product is materially misleading. Thus, the misrepresentation and concealment of the actual price of a product is likely to mislead a reasonable consumer who is acting reasonably under the circumstances.

142.    Sempris allowed and contributed to the deceptive and misleading representations made by Quality Resources when marketing its Membership Programs and further, failed to adequately review Quality Resources's enrollment practices so as to ensure that consumers were not deceptively enrolled in Sempris Membership Programs. Specifically, Sempris allowed or encouraged Quality Resources to make misrepresentations regarding:

(1)    the gift cards, vouchers, and/or rebates promised as incentives for consumers to try Sempris's Membership Programs and the promise that such incentives would arrive to consumers "soon";

(2)    the mailing of written membership materials to consumers enrolled in its Membership Programs, such that members are able to review membership benefits and information, and that membership materials would be sent "in the mail", "in writing", for consumers "to enjoy";

(3)    the timing and calculation of membership trial periods and when recurring monthly charges would begin; and

(4)    the consumer's ability to call and cancel membership at any time to avoid or stop recurring monthly membership charges.

143.    By committing the acts alleged in this Complaint, Quality Resources and Sempris have knowingly disseminated untrue and/or misleading statements in order to induce consumers to enroll in Sempris Membership Programs.

144.    Quality Resources and Sempris knew or should have known of the falsity of the representations made regarding Sempris's Membership Programs.

145.    Quality Resources and Sempris intended that consumers would rely and act upon their deceptive and fraudulent representations.

146.    Plaintiff and members of the Class did, in fact, rely upon Quality Resources and Sempris's misrepresentations to their detriment. Specifically, Plaintiff and the Class relied upon Quality Resources' misrepresentations regarding the telemarketing calls' purpose and relationship to consumers' Emson orders, as well as its misrepresentations regarding the identity of the entity offering the membership programs, by staying on the phone and listening to Quality

Resources' marketing pitches. Plaintiff and the Class further relied upon Quality Resources' and Sempris's misrepresentations regarding the terms and costs of membership enrollment (specifically those relating to the receipt of membership materials and promised incentives, the timing and amount of membership charges, and the ability to try out membership benefits before being charged recurring fees and call and cancel at any time), as well as the membership offers' connection to their Emson orders, by agreeing to trial enrollment in the advertised membership programs.

147.    The detriment suffered as a result of their reliance is evident from the unauthorized charges placed upon Plaintiff's and Class members' credit card and bank accounts. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money in justifiable reliance on Quality Resources and Sempris's misrepresentations of material facts.

148.    Plaintiff, on his own behalf, and on behalf of the Class, seeks an order (1) requiring Quality Resources and Sempris to immediately cease the unlawful practices alleged herein, and (2) awarding Plaintiff and the Class damages in an amount to be proven at trial, interest, and attorneys' fees and costs.

**<u>COUNT V</u>**
**Breach of Contract**
**(As against Defendant Emson)**
**(By Plaintiff individually and on behalf of the Class)**

149.    Plaintiff incorporates by reference the foregoing allegations.

150.    Defendant Emson on the one hand, and Plaintiff and members of the Class, on the other, entered into valid and enforceable contracts whereby those Class members provided and Emson accepted payments in exchange for goods marketed and sold by Emson. In order to facilitate their purchases, Plaintiff and the Class provided Emson with access to their billing and contact information.

151. A material term of the contract entered into by Plaintiff and the Class members with Emson required that Emson only share Class members' billing information with those expressly authorized to receive it. Likewise, a material term of the contract required Emson to only bill Plaintiff and the Class for charges that they authorized. The contract also implicitly incorporated all laws in effect at the time the contract was made, including the Restore Online Shopper's Confidence Act. These terms are generally implicit in consumer sales contracts.

152. Plaintiff and members of the Class did not consent to Emson releasing their billing or contact information to Quality Resources, nor did they consent to receiving any telemarketing calls from Quality Resources (made on behalf of Sempris and other disreputable third parties). At most, Emson obtained consent to share information with "reputable" third parties. Neither Quality Resources nor Sempris can reasonably be considered to be "reputable" third parties. Both are engaged in deceptive business practices at the center of their respective business models and, with respect to Sempris especially, have received hundreds of consumer complaints about their nefarious business practices.

153. Plaintiff and the other members of the Class did not agree to allow Emson to transfer their billing information for the purposes of allowing a third party to charge their accounts.

154. As a result of its sharing or making available its customers' private contact and billing information, Emson materially breached the terms of its contracts with Plaintiff and the other members of the Class.

155. Plaintiff and the other members of the Class have suffered damages in the form of monies lost as a direct result of Emson's acts and practices.

156.    Plaintiff, individually and on behalf of the Class, seeks damages for Emson's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT VI
**Alternative Claim for Breach of Contract**
**(As against Defendants Sempris and Quality Resources)**
**(By Plaintiff individually and on behalf of the Class)**

157.    Plaintiff incorporates by reference the foregoing allegations.

158.    In the hypothetical event that Defendants can show that Plaintiff and the Class entered into enforceable contracts despite Plaintiff and the Class's lack of assent to the actual terms of enrollment, any such agreement required Defendants to allow Plaintiff and Class members the ability to cancel their memberships at any time so as to prevent or stop recurring monthly membership charges. The agreement further required Defendants to timely send written membership materials to Plaintiff and Class members containing information regarding and necessary to access membership benefits. Likewise, any such agreement contained a provision obligating Defendants, specifically Quality Resources acting on Sempris's behalf, to provide the free gifts and gas vouchers promised in return for Plaintiff and the Class's agreement to enroll in the membership trial period.

159.    Plaintiff and the Class performed under the agreement by paying the introductory fee for their trial of Sempris's Membership Program(s).

160.    As a result of their unlawful conduct alleged herein, Sempris and Quality Resources materially breached the terms of their contracts with Plaintiff and the other members of the Class. Defendants breached the contract by serially delaying and/or failing to send out the promised written membership materials and gifts/vouchers. Defendants further breached the contract by charging Plaintiff and the Class recurring membership fees without Plaintiff and the

Class having had an opportunity to review the promised written membership materials prior to the imposition of monthly charges, and after Plaintiff had already called and cancelled his membership.

161.    Defendants' breach of their agreements with Plaintiff and members of the Class caused Plaintiff and the other members of the Class to suffer damages in the form of recurring monthly charges incurred and lost as a direct result of Defendants' acts and practices. Plaintiff and members of the Class additionally were damaged in the amount of the lost value of the gift cards and vouchers they were promised but that they never received.

162.    Plaintiff, individually and on behalf of the Class, seeks damages for Sempris and Quality Resources's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT VII
### Unjust Enrichment (*in the alternative to breach of contract*)
### (By Plaintiff individually and on behalf of the Class)

163.    Plaintiff incorporates by reference the foregoing allegations, excluding paragraphs 145 through 158.

164.    Defendant Emson knowingly received a monetary benefit from Plaintiff and the Class in the form of fees, revenue share, or other value given by Quality Resources and/or Sempris when Emson wrongfully permitted Quality Resources to obtain the Class members' contact and billing information. Quality Resources then used the information received from Emson to initiate deceptive telemarketing calls to Plaintiff and the Class members to enroll them in Sempris Membership Programs. Sempris later used this information to charge Plaintiff and the Class recurring monthly fees.

165.    Emson appreciates or has knowledge of such benefits.

166.    Emson has no valid basis to accept benefits that are derived from Sempris charging Class members' for unauthorized membership fees.

167.    Quality Resources knowingly received a monetary benefit from Plaintiff and the Class in the form of fees, revenue share, or other value given by Sempris after Quality Resources deceptively enrolled Plaintiff and the Class in Sempris Membership Programs.

168.    Quality Resources appreciates and/or has knowledge of those benefits.

169.    Plaintiff and the other members of the Class have no adequate remedy at law against Quality Resources.

170.    Sempris, knowingly and without authorization, charged the credit and debit accounts of Plaintiff and the other members of the Class for its Membership Programs.

171.    As a result, and despite having no valid or legal basis to do so, Sempris unjustly received and continues to receive a monetary benefit in the form of membership fees charged to those accounts.

172.    Sempris appreciates and/or has knowledge of those benefits.

173.    Under principles of equity and good conscience, Defendants should not be permitted to retain the benefits they wrongfully received from Plaintiff and the other members of the Class as a result of their unlawful conduct.

174.    Plaintiff, individually and on behalf of the Class, seeks restitution of all monies Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

<u>**COUNT VIII**</u>
**Violation of the Telephone Consumer Protection Act ("TCPA")**
**47 U.S.C. § 227**
**(As against all Defendants)**
**(By Plaintiff individually and on behalf of the TCPA Subclass)**

175.    Plaintiff incorporates by reference the foregoing allegations.

176.    Enacted by Congress to protect consumers from intrusive telemarketing practices, the TCPA makes it unlawful for telemarketers to call a consumer's cellular telephone number using any automatic telephone dialing system without the consumer's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii).

177.    Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1)(A)-(B).

178.    Defendant Quality Resources initiated unsolicited telemarketing calls to the cellular telephone numbers of Plaintiff and the members of the Subclass on behalf of Defendants Emson and Sempris.

179.    Defendant Emson provided Quality Resources with access to consumer information, including contact, billing, and order information, that was within Emson's exclusive control. Emson further provided Quality Resources with the authority to use its trademarks and/or trade name, such as the trade name "Chair Gym", during the course of the telemarketing calls. Accordingly, a reasonable consumer would sensibly assume that Quality Resources was acting as an agent of Emson and on its behalf.

180.    Defendant Sempris contractually authorized Quality Resources to market Sempris Membership Programs on its behalf and provided Quality Resources with access to detailed

information regarding the nature and pricing of its Membership Programs that was within Sempris's exclusive control. Sempris further provided Quality Resources with the authority to use its trademarks and/or trade names, such as the trade name "Budget Savers", during the course of the telemarketing calls. Accordingly, a reasonable consumer would sensibly assume that Quality Resources was acting as an agent of Sempris and on its behalf.

181.    Plaintiff and the Subclass did not provide Defendants with their prior express consent to receive such calls.

182.    Further, the telephone calls were made using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers.

183.    By making the unsolicited telephone calls to Plaintiff and the Subclass's cellular telephones without prior express consent, and by utilizing an automatic telephone dialing system, Defendants have violated 47 U.S.C. § 227(b)(1)(A)(iii).

184.    Further, Sempris and Emson knew or reasonably should have known that Quality Resources was violating the TCPA on their behalf but failed to take affirmative steps to correct Quality Resources's behavior.

185.    As a result of Defendants' unlawful conduct, Plaintiff and the members of the Subclass suffered actual damages in the form of monies paid to receive the unsolicited telephone calls on their cellular phones and under section 227(b)(3)(B) are each entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

186.    Should the Court determine that Defendants' conduct was willful and knowing, the Court may, pursuant to section 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric Herman, individually and on behalf of the Classes, requests that the Court enter an Order providing for the following relief:

A.      Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

B.      Declare that Defendants' actions, as set out above, violate M.C.L § 445.903 *et seq*., 15 U.S.C § 1693e, *et seq*, 47 U.S.C. § 227(b)(1)(A)(iii); and constitute breach of contract, unjust enrichment, fraudulent inducement and fraud by omission;

C.      Award all economic, monetary, actual, consequential, statutory and compensatory damages caused by Defendants' conduct, and if the conduct is proven to be willful, award Plaintiff and the Classes exemplary damages;

D.      Award restitution against Defendants for all money to which Plaintiff and the Classes are entitled in equity;

E.      Award Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

F.      Award Plaintiff and the Classes pre- and post-judgment interest, to the extent allowable;

G.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Classes; and

H.      Award such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,


Dated:  September 10, 2013                **ERIC HERMAN**, individually and on behalf of
all others similarly situated,

By:  /s/ Alicia E. Hwang
      One of Plaintiff's Attorneys

Steven L. Woodrow
swoodrow@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Christopher L. Dore
cdore@edelson.com
Benjamin H. Richman
brichman@edelson.com
Alicia Hwang
ahwang@edelson.com
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370

Barry Conybeare
CONYBEARE LAW OFFICES, P.C.
519 Main Street
St. Joseph, MI 49085
barry@conybearelaw.com
(269) 983-0561

## CERTIFICATE OF SERVICE

I, Alicia E. Hwang, an attorney, hereby certify that on October 10, 2013, I served the above and foregoing ***First Amended Class Action Complaint***, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 10th day of October 2013.

/s/Alicia E. Hwang